UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| JEREMY COOPER | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 5:21cv132-RWS-JBB |
| | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

On November 11, 2021, Jeremy Cooper ("Plaintiff") initiated this civil action pursuant to the Social Security Act ("The Act"), Section 405(g) for judicial review of the Commissioner's denial of Plaintiff's applications for Social Security benefits. The Court is of the opinion the above-entitled social security action should be **REVERSED AND REMANDED.**

HISTORY OF THE CASE

On April 27, 2012, Plaintiff protectively filed an application for disability insurance benefits, claiming disability beginning December 22, 2010, due to degenerative disc disease, a bulging disc, nerve damages in the leg, and migraines (Dkt. No. 12, "Tr." at 10, 12, 94, 201, 209, 219, 490-91, 559, 644). The Commissioner denied Plaintiff's application initially and on reconsideration (Tr. 262-65, 269-74, 329-36, 341-43, 374-76). Plaintiff subsequently requested a hearing before an Administrative Law Judge ("ALJ"). An ALJ held a hearing on December 11, 2013, and, after reviewing the evidence and hearing testimony, the ALJ issued a decision on January 14, 2014, finding Plaintiff was not disabled under the Act (Tr. 91-113, 177-99). Plaintiff requested Appeals Council review which was denied on May 21, 2015 (Tr. 115-19).

Plaintiff then appealed this decision to the United States District Court. On August 4, 2016, the Court remanded the case for further proceedings as to whether Plaintiff should have been awarded a closed period of disability from December 22, 2010 through some point prior to January 14, 2014,

1

the date of the ALJ's first decision (Tr. 140-73) (further noting that on remand the ALJ should consult with a vocational expert to clarify the implications for the occupational base regarding the limitation of ability to sit or stand and Plaintiff's allegations of pain during the closed period of disability). The Appeals Council remanded the case to an ALJ for further proceedings and, noting that Plaintiff had filed subsequent claims for Title II and Title XVI benefits on July 27, 2015, ordered the claims to be consolidated (Tr. 174-76).

A new ALJ held a hearing on August 7, 2017 (Tr. 36-60), and subsequently issued a new decision on October 27, 2017, again finding Plaintiff not disabled under the Act (Tr. 230-45). Plaintiff filed written exceptions to that ALJ decision. On July 26, 2019, the Appeals Council again remanded the case to the ALJ for further review of opinion evidence from Plaintiff's treating physicians, Dr. Henry Platt and Dr. Gregory Montoya (Tr. 257-60).

Pursuant to the Appeals Council's remand, a new ALJ held a hearing on February 18, 2020 (Tr. 62-88). After reviewing the evidence and hearing testimony, the ALJ issued a decision on April 8, 2020, again finding Plaintiff was not disabled under the Act (Tr. 6-23). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review on October 6, 2021 (Tr. 1-5). Plaintiff then filed this action pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF THE FACTS

### Age, education, and work experience

Plaintiff was born August 20, 1976 and was thirty-four years of age on the alleged onset date (Tr. 38-39). Plaintiff has a high school education and past work experience as a parts clerk, roofer helper, millwright helper, assembler, and car rental agent (Tr. 39-40, 55).

*Medical record evidence*

On December 20, 2007, Plaintiff presented to Ronald D. Rush, M.D., complaining of low back pain (Tr. 2038). Plaintiff reported he hurt his back at work in 2003, and he had a "bad flare up of his pain and symptoms in 2005 that prevented him from walking." (Tr. 2038). On February 19, 2008, Plaintiff followed up with Dr. Rush following an MRI for his back pain and leg symptoms (Tr. 2039-40). The assessment was lumbar disc displacement; peripheral neuropathy; and migraine (Tr. 2040). Dr. Rush noted the MRI showed some lumbar disc displacement which likely accounted for his peripheral neuropathy and intermittent teste pain (Tr. 2040).

On March 9, 2009, Plaintiff returned to Dr. Rush with new pain in his back which started along the low right back and radiated to the hip and buttock (Tr. 2041). Plaintiff also reported spasms and muscle pain (Tr. 2041). On examination, Plaintiff had a "gait leaning on left side" and pressure on the right sciatic nerve causeing pain in the buttocks with radiation to the right calf (Tr. 2042). Assessments included sciatica; lumbalgia; and radicular syndrome of lower limbs (Tr. 2042). On April 16, 2009, Dr. Rush went over MRI results with Plaintiff, noting the MRI showed "sequestered disc fragment in right lateral recess of L3/L4 with L4 nerve root impingement, and a central disc protrusion L3/L4 which [was] worse than last MRI." (Tr. 2043). On February 1, 2010, Dr. Rush noted Plaintiff had leg and back pain and Dr. Buono was supposed to be performing surgery at some point in the future (funded through Texas Rehab) (Tr. 1271-73).

Plaintiff first visited Lee M. Buono, M.D., on April 7, 2008 (Tr. 728-29). Plaintiff came to the appointment complaining of low back pain since 2003 and pain in his right leg (Tr. 728). Dr. Buono noted Plaintiff's pain was worse with changing in position; "therefore, he does have a strong element of mechanical back pain." (Tr. 728). Plaintiff brought to the appointment an MRI of his

lumbar spine, which showed, among other things, a "relatively normal lumbar lordosis with a lumbarized sacrum." (Tr. 729).

At his June 29, 2009 appointment with Dr. Buono, Plaintiff complained of worsening back pain with severe right leg pain, numbness, and weakness which radiated down his right leg (Tr. 730). On examination, Plaintiff had a positive straight-leg-raise on the right at 30 degrees, decrease in pin sensation in a right L5 distribution, weakness in his right tibialis anterior at 4+/5, and an antalgic gait on the right (Tr. 730). Plaintiff brought with him an MRI of his lumbar spine which showed as follows:

> This reveals a relatively normal lumbar lordosis with a huge disk herniation on the right at L4-5: an extruded fragment which is crushing the L5 nerve root and is the cause of his symptoms. He also had degenerative disk disease at L4-5 and L2-S1, and his conus ends at L1-2 without significant signal change.

(Tr. 731). According to Dr. Buono, the biggest problems were the neurological deficits and the leg pain (Tr. 731).

Dr. Buono recommended a L4-5 hemilaminectomy and diskectomy in order to decompress the nerve and preserve neurological function. However, Dr. Buono recommended against surgical treatment for Plaintiff's degenerative disc disease because Plaintiff was too young for a fusion (Tr. 731). Dr. Buono scheduled the hemilaminectomy and diskectomy and informed Plaintiff he would still have some back problems due to his degenerative disc disease. Plaintiff was admitted into CHRISTUS St. Michael Hospital on February 25, 2010 and underwent the scheduled surgery (Tr. 742-44, 792-93); *see also* Tr. 742 ("Preoperative Diagnosis: Herniated lumbar disk, L4-L5 on the right. . . Procedure Performed: Right L4-5 hemilaminectomy with L4-5 diskectomy and removal of large fragment.") (internal capitalization removed).

 Plaintiff returned to Dr. Buono in early March of 2010 following his surgery (Tr. 731). Dr. Buono noted Plaintiff was still "a little sore in his back, but his leg pain [was] gone." (Tr. 731).

Plaintiff still complained of numbness below his knee, but Dr. Buono told him it might take some time to go away. Dr. Buono stated Plaintiff had great strength in his EHL and tibialis anterior and scheduled him for follow up four weeks later (Tr. 731).

Plaintiff returned for his follow up appointment on March 31, 2010 (Tr. 732). Plaintiff showed continued improvement after his lumbar decompression; he had only occasional soreness in his leg; the numbness was going away, and Plaintiff was "very happy with the results of his surgery." (Tr. 732). Dr. Buono noted Plaintiff's wound was well healed. However, Plaintiff returned to Dr. Buono on August 2, 2010, complaining of occasional cramps in his leg and hip area (Tr. 732). While Plaintiff noted the numbness in his leg was "a little bit better," Dr. Buono believed "he ha[d] poor range of motion on physical examination." (Tr. 732). Dr. Buono scheduled Plaintiff for physical therapy and referred Plaintiff to Dr. Brett Dietze with Neurosurgical Associates of Texarkana.

Plaintiff had several appointments with Henry Platt, M.D., at Wake Village Healthcare Express in July, August, November, and December of 2010 for medication refills (Tr. 1312-24, 2048-57). Plaintiff reported neck and back pain, as well as pain and numbness in his right leg (Tr. 1312, 1314, 1316). According to Plaintiff, he was using pain medication in order to be able to keep working, and his "story matched to what Dr. Rush reported." (1315). Examination revealed lumbar tenderness, positive pain in the lumbosacral region, and position right straight-leg-raise test (Tr. 2049). At the November and December appointments, Plaintiff was limping and walking with a cane (Tr. 2053, 2055).

On December 17, 2010, John Flint, P.T. with CHRISTUS St. Michael Outpatient Rehabilitation Center provided an Initial Assessment regarding Plaintiff's physical therapy (Tr. 799-801). According to Flint, Plaintiff alleged a sudden onset of lower back pain after pinching a

nerve while lifting in January of 2009 (Tr. 799). Plaintiff described the pain as an ache, and he rated it as an eight out of ten on the point scale. Flint noted Plaintiff's level of function prior to the incident was independent with all activities and that Plaintiff was using a cane for gait at the time (Tr. 799). Plaintiff denied problems with balance or gait and had no falls within the previous six months (Tr. 800). Flint noted Plaintiff had an antalgic slow guarded movement pattern; mild tenderness to his lumbar region and his right buttock area; a left lateral shift of the lumbar spine as observed posteriorly; normal reflexes; positive long sit test, and the appearance of right lower extremity increase from supine to sit (Tr. 800).  According to Flint, Plaintiff's strength measures were assessed at a 3/5 due to complaints of pain with straight-leg-raising (Tr. 800). Flint concluded with the following plan: "Modalities are needed for pain, strengthening, ROM, education, home exercise program, and progress to resistive activities as tolerated. Patient to be seen 3x week for the next 4 weeks." (Tr. 801).

On February 4, 2011, Flint emailed his discharge notes to Dr. Dietze (Tr. 795). Flint noted Plaintiff had been seen for eighteen visits; he had given excellent effort with each aspect of care, but he was not responding favorably in that he still reported testicular pain associated with some of his lower extremity activities (Tr. 795). Flint recommended Plaintiff return to Dr. Dietze for follow up and that Plaintiff be discharged from therapy with "limited potential to benefit at the time." (Tr. 795).

Plaintiff returned to Dr. Dietze on February 7, 2011 (Tr. 732). Plaintiff complained of "persistent pain in his right buttock and circumferentially around his thigh with (more recently) pain radiating into his right testicle which he said started during a recent course of physical therapy." (Tr. 732). Dr. Dietze ordered a new MRI (Tr. 732). When Plaintiff returned in early June of 2011, Dr. Dietze noted some mild postoperative changes but stated there was nothing

6

structurally significant (Tr. 733). Dr. Dietze concluded there was nothing more that could be done surgically.  He suggested pain management (Tr. 733).

On June 3, 2011, Plaintiff received an MRI from Advanced Imaging of Texarkana (Tr. 734). Dr. Hill found no fracture or subluxation present, as well as no lytic or blastic lesions being noted. Mild degenerative disc disease was noted at the L4-5 and L5-S1 levels. No adverse features from the right hemilaminectomy were noted, and there were no recurrent disc protrusions. Dr. Hill found minimal appropriate postoperative enhancement. A small central disc protrusion was noted, without evidence of spinal canal or lateral recess stenosis. Dr. Hill found moderate disc disease with mild generalized disc bulging at L5-S1. However, there was no disc protrusion or spinal canal stenosis. At the L3-4, L2-3, and L1-2 levels there was no significant disc disease, traumatic injury, or disc protrusion noted. Dr. Hill found everything else to be normal and unremarkable (Tr. 734).

Plaintiff presented to Healthcare Express on March 11, 2011, with a chief complaint of sharp lower back pain at a severity of 8/10 (Tr. 816-17). On examination, Plaintiff had an altered gait and posture, with his "torso hunched forward, walk[ed] with a cane." (Tr. 816). It was noted there was spasm/tenderness of paraspinal muscles and reduced range of motion in the back (Tr. 816-17). His diagnosis was lumbago (Tr. 817). Plaintiff returned in April, June, and July of 2011 for pain medication refills (Tr. 821-33). Plaintiff had normal gait at the first two appointments, but his gait and posture were slightly antalgic at the July appointment, and he had reduced range of motion in his back (Tr. 830). Diagnoses included lumbago and "UNS Thoracic/Lumb Neuritis/Radicul." (Tr. 831).

Plaintiff visited Healthcare Express on August 2, 2011, complaining of constant pain in the lower back (aching, sharp, shooting, and throbbing), numbness and tingling in his right leg, depression, and joint pain (Tr. 834-37, 1000-05). Plaintiff was found to have spasms/tenderness of

7

the right paraspinal muscles; a positive left straight-leg-raise test and approximately a 110 degree right straight-leg-raise test; and reduced range of motion in his back (Tr. 834). Plaintiff was found to have a normal mood and affect; normal lower extremity strength bilaterally; normal gait and posture; no spinal kyphosis or scoliosis; no loss of lumbosacral lordosis; and lower extremity deep tendon reflexes 2+ and equal bilaterally (Tr. 835). Plaintiff was diagnosed with a stable/improved Lumbago and a worsening UNS Thoracic/Lumb Neuritis/Radicul (Tr. 835). Plaintiff was instructed to return to the clinic on August 31 for a recheck, as well as pain management techniques (Tr. 835).

When Plaintiff returned, he stated the medication was helping, but he complained of recent joint and muscle pain (Tr. 838-39). Plaintiff showed no changes in his examination from his last visit. He was noted to have a stable/improved UNS Thoracic/Lumb Neuritis/Radicul (Tr. 839). Plaintiff returned again to Healthcare Express at the end of September 2011, complaining of numbness and muscle pain (Tr. 842-45). Plaintiff was noted to be in obvious distress, with spasm/tenderness of paraspinal muscles and decreased range of motion in the back (Tr. 843). Plaintiff was prescribed Norco and Valium for pain and instructed to return to the clinic in one month (or three days if his condition did not improve) (Tr. 843).

On December 25, 2011, Plaintiff returned to Healthcare Express, complaining of aching and dull lower back pain at a 5/10 level of severity (Tr. 846-47). Plaintiff stated the pain was made better by rest and medication and worse by movement; he also reported numbness and weakness (Tr. 846). Plaintiff was found to be in obvious distress ("chronic moderate"); he had an altered gait and posture ("walking slowly and leaning forward"); he had spasm/tenderness of paraspinal muscles; and he had diffuse spinal tenderness of lumbar spine and decreased range of motion in his back (Tr. 847). Plaintiff was also found to have normal lower extremity strength bilaterally;

normal mood and affect; and lower extremity sensation was intact bilaterally (Tr. 847).  Plaintiff was prescribed Norco and Valium and was instructed to return on January 17, 2012 (Tr. 847).

When Plaintiff returned for his scheduled appointment, he stated his pain was reduced from severe to moderate (Tr. 862-63). Plaintiff still complained of numbness, tingling, and weakness (Tr. 862). Plaintiff had normal lower extremity strength bilaterally; normal gait and posture; lower extremity sensation intact bilaterally; and normal mood and affect (Tr. 357). However, he still had diffuse tenderness of the lumbar spine (Tr. 862). Plaintiff had appointments in February, March, and April 2012 for medication refills and had altered gait and posture ("walking slowly and leaning forward") at the first two visits (Tr. 867, 871).

Plaintiff again returned to Healthcare Express on May 8, 2012, complaining of joint and muscle pain and a pinch in his back when he would bend over (Tr. 878-79). On examination, Plaintiff had spasm/tenderness of paraspinal muscles; tenderness of lumbar muscles in the right paraspinal muscles; tenderness of lumbar muscles in the left, paraspinal muscles; and spinal tenderness of the lumbar spine (Tr. 879). However, Plaintiff was also found to have normal gait and posture; normal lower extremity strength bilaterally; normal back range of motion; and lower extremity sensation intact bilaterally (Tr. 879).

Plaintiff received a clinical interview with mental status examination by Donna Schuyler, Ph.D. at the beginning of August 2012 (Tr. 888-93). Plaintiff drove himself to the interview and walked with the aid of a cane.  He exhibited a labored gait (Tr. 888). Plaintiff was cooperative, but he displayed an anxious, irritable demeanor to the point of claiming "he was feeling nauseated and had to leave the office, apparently having a panic attack" during the examination (Tr. 888). Plaintiff became tearful a couple of times when relating information regarding his present circumstances.

According to Plaintiff, he had recently developed anxiety prompted by physical health and financial issues because of his inability to continue working (Tr. 888).

Plaintiff reported injuring his back in 2003, but he was able to function "quite well" until he picked up something heavy in 2009, reinjuring his back (Tr. 888-89). According to Plaintiff, he was in constant pain following surgery in February of 2010; he could not sit, stand, or walk for extended periods; he had a very limited range of motion; and he had very limited physical capabilities (Tr. 889). Plaintiff claimed he realized after surgery that he was not going to return to his previous level of functioning, and he began to have thoughts that he was not going to be able to work and support his family (Tr. 889). Soon after this realization hit him, Plaintiff began to experience anxiety attacks. Plaintiff described them as follows" "I can't breathe, my heart hurts, and I feel like I'm going to pass out." (Tr. 889).

In addition, Plaintiff alleged free-floating anxiety on most days; insomnia; decreased appetite; crying spells; and overwhelming feelings of hopelessness and helplessness (Tr. 889). Plaintiff expressed considerable anger numerous times. Plaintiff's ability to complete tasks appeared to remain intact (Tr. 889). Plaintiff alleged he could historically deal with routine stress, but he was becoming overwhelmed by his current difficult circumstances (Tr. 889). Plaintiff stated he had two children, ages thirteen and fifteen, and three stepchildren (Tr. 890). Plaintiff reported graduating from high school with good academic skills, but he stated he was sent to an alternative school the latter part of his academic career "for skipping school and drinking." (Tr. 890).

Plaintiff alleged his last job was a car rental agent which he worked from 2004 to 2009. Plaintiff attempted to return to work after his injury in 2010, but his physical problems did not allow him to adequately perform his job duties (Tr. 890). Plaintiff was able to attend to all basic self-care needs, but his limited range of motion caused issues with dressing himself, as well as

extended housework. Plaintiff knew how to cook and perform all routine house cleaning chores, but stated his children performed the cleaning since his alleged accident (Tr. 890). Plaintiff was able to drive, and he was supported through his wife's work as well as child support from his ex-wife and a Social Security check drawn by his sixteen-year old stepson (Tr. 890). Plaintiff exhibited a labored gait and walked with the aid of a cane (Tr. 890-91).

Plaintiff exhibited mood-congruent depressive themes and preoccupation with his current circumstances (Tr. 891). Plaintiff displayed "a constricted range of affect, primarily irritable and anxious. He appeared to have a panic attack during the examination." (Tr. 891). Dr. Schuyler's prognosis was fair; Plaintiff appeared to be suffering from some significant mental health issues in response to his adverse life circumstances, but he appeared to maintain the ability to reason and make social, personal, and occupational adjustments (Tr. 892).

Gregory Montoya, M.D., performed a Psychiatric Evaluation on October 15, 2012 (Tr. 1085-99). Plaintiff had been referred due to his depressed and anxious mood, which appeared to have worsened due to Plaintiff's situational stressors, including his degenerative disc disease (Tr. 1085). During an interview with Dr. Kirkpatrick, Plaintiff mentioned other stressors in his life, such as his wife's pseudoseizures and kidney impairment; his chronic pain; their applications for disability; and serious behavioral problems of his son (Tr. 1085).

Plaintiff alleged difficulties in sleeping; a constant sad mood; angry thoughts towards others; a loss of concentration; a decrease in interest in pleasurable activities; and a low energy level. Plaintiff denied suicidal thoughts; plans to harm others; angry outbursts; and delusional thinking. Dr. Montoya observed Plaintiff as cooperative, honest, sad, and open. He assigned Plaintiff a score on the depression scale of 12 (Tr. 1085).

Dr. Montoya noted no decrease in energy, excessive guilt, appetite changes, concentration difficulties, or suicidal thoughts. Plaintiff alleged a long history of drug abuse, including twenty years of marijuana use and heavy drinking, but Plaintiff claimed he stopped two to three years prior (Tr. 1085). Plaintiff was able to throw a football at times and sometimes changed the brakes in his car. Plaintiff reported having been fired from jobs for anger. Plaintiff referred to himself as someone with a "bad temper." Plaintiff was taking Celexa, Valium, and Norco at the time; although the medications were relatively effective, Plaintiff did not think the Celexa helped his anxiety and requested a change in antidepressant (Tr. 1085-86).

Plaintiff recorded a medical history of diseases of the nervous system; musculoskeletal/connective tissue diseases; three bulging discs, degenerative disc disease; migraine headaches; and sciatica in right leg (Tr. 1087). Dr. Montoya found Plaintiff to have the following clinical disorders and conditions: major depression; anxiety; cannabis abuse; polysubstance dependence; chronic back pain; and neuropathy/sciatica (Tr. 1096).

During the timeframe of October 2012 to October 2013, Plaintiff repeatedly saw Marilyn Strong, LPC, at Community Healthcore for Treatment Plan Review Mental Health Services (Tr. 1007-1203). In June of 2013, Plaintiff showed improvement in his gait, which he attributed to his medication (Tr. 1036). Plaintiff reported financial stressors in his life, including stressors related to his health and his wife's health (Tr. 1036). Plaintiff was instructed to practice relaxation and coping techniques and to perform physical activities within his capabilities. At his August 2013 session, Licensed Professional Counselor Strong noted Plaintiff was still walking with the aid of a cane, but his movements appeared better (Tr. 1037).

During an Evaluation and Management Exam with Dr. Montoya on February 1, 2013 (Tr. 1113-24), Plaintiff had a normal gait (Tr. 1117), but Plaintiff reported persistent sciatic pain in the

right leg (Tr. 1114). Plaintiff presented to CHRISTUS St. Michael on March 8, 2013, complaining of lower back pain after a fall three days prior (Tr. 950-57).

Plaintiff visited UAMS Southwest Family Practice Clinic on March 27, 2013, after experiencing multiple falls, the most recent two weeks prior (Tr. 926-30). The history of present illness was as follows:

> Patient sees Dr. Platt for pain management - been seeing him for over 1 year. Had back surgery in 2010 for degenerative disk disease. Dr. Platt would like to do a cervical spine MRI but they won't accept his referral, and [patient] needs an MRI referral from a PCP. When asked about why he's falling, [patient] says it's like he's tripping on his own feet.

(Tr. 926). Verified current problems included localized superficial swelling mass or lump, neck pain, depression, and chronic back pain (Tr. 926). On examination, Mark G. Viegas, M.D., noted Plaintiff had "pain intermittent palpation," abnormal gait (walked with a cane), and reduced range of motion (could not bend forward or straighten back) (Tr. 929). Dr. Viegas ordered an MRI c-spine and x-ray of the lumbar spine, noting Plaintiff had a history of sciatica in the right lower extremity (Tr. 926). Plaintiff returned to CHRISTUS St. Michael on March 31, 2013, complaining of continuing back pain and also neck pain for the previous two days (Tr. 938-39).

In a Medical Release/Physician's Statement dated April 9, 2013, Henry J. Platt, M.D., opined Plaintiff could sit, stand, and walk for only very limited time due to frequency of breaks for pain; he could not climb stairs/ladders, kneel/squat, bend/stoop, push/pull, or lift/carry; and he could use a keyboard for four hours but would need frequency of required breaks for pain (Tr. 2058). Dr. Platt opined Plaintiff could not lift/carry objects more than two (2) pounds for more than four (4) hours per day (Tr. 2058). Dr. Platt noted Plaintiff has to frequently stand and move to find a position of comfort (Tr. 2058). Dr. Platt concluded Plaintiff's disability was permanent, noting Plaintiff's primary disabling diagnosis was low back pain and his secondary disabling

13

diagnosis was radiculopathy and weakness on the legs (Tr. 2058). According to Dr. Platt, Plaintiff has weakness, nerve injury in his right leg that is permanent, as well as neck pain and emotional issues (Tr. 2058).

At his April and June 2013 examinations at Community Healthcore, Dr. Montoya stated Plaintiff's psychiatric scores correlated with a moderately severe degree of clinical depression with occasional suicidal ideations but no suicidal intentions (Tr. 1127, 1140). Plaintiff made multiple visits to Healthcare Express from April to October of 2013 (Tr. 963-76). The August 13, 2013 record reveals as follows:

> The patient presents with a chief complaint of constant (but worse at times) back pain of the lower back since 2009. It has the following qualities: dull and aching. The patient describes the severity as moderate. The problem is made better by heat application and medication and made worse by movement and standing. Context: The patient reports it was the result of an injury. The patient reports that onset was associated with an injury, prolonged standing/walking. The patient also reports joint pain and muscle pain as abnormal symptoms related to the complaint.

(Tr. 968). Plaintiff was diagnosed with lumbago, cervicalgia, generalized anxiety order, muscle weakness, and/or sensory problems with limbs (Tr. 963, 967, 969, 973, 975)

Plaintiff revisited Dr. Montoya on September 16, 2013, complaining of increased stress after he quit smoking marijuana, which he had been previously taking to ameliorate pain and stress (Tr. 1150-51). Noting his anxiety was a lot worse, Plaintiff claimed he may have erred in quitting Cymbalta a few months prior (Tr. 1150).

Dr. Montoya completed a Mental Impairment Evaluation Form on December 6, 2013 (Tr. 1210-18), noting Plaintiff suffered from affective disorders; anxiety related disorders; and personality disorders (Tr. 1210). Under affective disorders, Plaintiff exhibited sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilty or worthlessness; and difficulty concentrating or thinking (Tr. 1212). Under anxiety related disorders, Plaintiff displayed

generalized persistent anxiety accompanied by motor tension (Tr. 1213-14). Under personality disorders, Plaintiff exhibited hostility; persistent disturbance of mood or affect; pathological dependence, aggressivity; and intense and unstable interpersonal relationships and impulsive and damaging behavior (Tr. 1215). Dr. Montoya opined Plaintiff was moderately impaired in his mental ability to do work related activities (Tr. 1216). Plaintiff was found to have the following abilities for making occupational adjustments: unlimited abilities to follow work rules; good abilities to use judgement, function independently; fair abilities to interact appropriately with co-workers, deal with the public, interact appropriately with supervisors; good to fair abilities to maintain attention/concentration; and poor abilities to deal with work stress (Tr. 1216). Plaintiff had an unlimited ability to understand, remember, and carry out detailed, but not complex instructions as well as simple instructions; but Plaintiff had a good ability to understand, remember, and carry out complex instructions (Tr. 1217).

Under abilities to make personal and social adjustments, Plaintiff was found to have the following: good abilities to maintain personal appearance and demonstrated reliability in work practices, including attendance; good to fair abilities to react predictably and appropriately in social situations; and fair to poor abilities to behave in an emotionally stable manner (Tr. 1217). Dr. Montoya found Plaintiff's impairments lasted, or could be expected to last, at least twelve months; but he also found Plaintiff capable of working an eight hour day on a regular basis (Tr. 1217). Finally, Dr. Montoya found that Plaintiff's impairments would cause him to be absent from work less than once a month (Tr. 1218).

Plaintiff had another MRI of his back on June 2, 2014, which revealed the following impression:

> 1. L1-2, L2-3, L3-4: Discs are unremarkable. Minimal facet arthrosis. Canal and foramina are widely patent.

2. L4-SI: Advanced DDD with loss of disc height. Centralize protrusion and associated annular tear noted. This allows for mild effacement of the anterior sac. Remote right hemilaminectomy defect is noted. Foramina are widely patient.

3. L5-6: Advanced DDD with loss of height and desiccation. Mild facet arthrosis. Asymmetric disc bulging allows for moderate left lateral recess stenosis.

(Tr. 1220). An MRI of Plaintiff's neck revealed mild facet arthrosis at C2-C5 and mild DDD at C5-6 (Tr. 1221).

At his August 4, 2015 routine follow up appointment at Healthcare Express (Tr. 1504-06), Plaintiff reported aching and dull back pain at a current pain level of 7/10 (Tr. 1504-05). Plaintiff noted 60% pain relief with his current treatments and medications (Tr. 1504). On examination, Dr. Platt noted Plaintiff had an abnormal gait (walked with a cane usually, wide base, antalgic), reduced range of motion limited to Plaintiff's L Spine, and positive TTP (tender to palpation) of the L Spine (Tr. 1505). Plaintiff received a cortisone injection at CHRISTUS St. Michael Hospital on August 15, 2015 (Tr. 1556).

On September 1, 2015, Plaintiff returned to Healthcare Express with low back and right leg pain (Tr. 1501-03). Plaintiff's gait was slow to stand erect, hunched forward while walking (Tr. 1502). Nurse Practitioner Tonile Pounds noted she had tried repeatedly to get an MRI of the L-Spine covered but that Plaintiff's insurance would not cover it (Tr. 1502). At his September 29, 2015 appointment, Plaintiff did not have his cane, but he was slow to stand and slightly hunched forward (Tr. 1498). Plaintiff was using a cane at his late October 2015 appointment and had an antalgic gait and limited range of motion (Tr. 1494).

On February 17, 2016, Plaintiff presented to Nurse Practitioner Johnia Kyles at East Texas Border Health for post Wadley Regional Medical Center hospital visit for back pain (Tr. 1803-06). Plaintiff reported sharp low back pain radiating to the buttocks and legs (Tr. 1805). On

examination, Nurse Practitioner Kyles noted Plaintiff had tenderness and limited range of motion and was ambulatory with a cane (Tr. 1806). Nurse Practitioner Kyles advised Plaintiff to continue using pain medications, TENS unit, heating pad, and cane (Tr. 1806).

Although it is dated after Plaintiff's date last insured of March 31, 2016, the Court notes that on June 23, 2016 (Tr. 1800-03), Plaintiff presented to Nurse Practitioner Kyles with right lower back pain which had increased over the past several months (Tr. 1802). Plaintiff reported he had fallen several times due to increased weakness (Tr. 1802). On examination, Kyles noted abnormal muscle strength; weakness to right lower extremity with atrophy to right ankle; malalignment, tenderness, and limited range of motion; tenderness to palpation in right lower lumbar paraspinal muscle into the right buttock; and positive straight leg raise, "sit slump with concordant pain to right, relieved with cervical flexion." (Tr. 1802) (capitalization removed). Plaintiff was ambulating with a cane and had irregular and antalgic gait with diminished, asymmetrical reflexes (Tr. 1802). Kyles advised Plaintiff to use a cane as needed for increased weakness (Tr. 1803). She also ordered an L-Spine MRI (Tr. 1803).

On July 5, 2016, Plaintiff again presented to Nurse Practitioner Kyles (Tr. 1797-1800), complaining of right lower back pain, numbness of the legs/feet, tingling, and bilateral tremors with standing and squatting in bilateral legs (Tr. 1799). On examination, Kyles made similar findings as before, further noting Plaintiff had "intention tremor." (Tr. 1799).

Plaintiff had another MRI later in July of 2016 (Tr. 1652-53). The MRI was compared to the previous 2014 examination and provided the following impression:

1. At the L4-5 level, postoperative changes of previous right hemilaminectomy are noted as before. There are moderate/severe changes of degenerative disc disease noted. There is a new right paracentral disc protrusion present producing severe right lateral recess stenosis. Correlation with the patient's symptoms is necessary. Further evaluation with CT myelography may be helpful.

17

2. At the L5-S1 level, moderate degenerative disc disease is present as before with generalized disc bulging extending to the left and producing mild left lateral recess stenosis as before.

3. The examination is otherwise unchanged and unremarkable.

(Tr. 1652).

Plaintiff was evaluated at CHRISTUS Trinity Clinic Neuroscience Institute on October 19, 2016, following referral from Nurse Practitioner Kyles (Tr. 1888-90). Todd Patrick, M.D., provided the following history of present illness:

[Plaintiff] . . . injured his back in 2009 and had severe right lower extremity pain from a disc rupture at L3-L4 and ultimately underwent surgery in 2010. He states he was not really better after that surgery and in fact in some ways was worse and had discomforting paresthesia and pain in the lateral aspect of his leg onto the top of the foot and anterior shin as well as development of knots and occasionally loss of hair that affects him at all times particularly at night and seems to have no activity relation to it. He frequently walks with a cane as he thinks this eases his pain.

Beginning sometimes after 2014, he began to have increasing issues without obvious antecedent event and is complaining of night stab in the buttock now, but beyond both sides and occasionally worse on the right and will radiate around to the anterior groin on occasion. This is exacerbated with standing, walking and leaning forward in particular.

The patient was on chronic pain medication but these [ceased] several months ago. In retrospect, he does not think the chronic narcotics were particularly helpful. TENS unit helps him somewhat, but not satisfactory and has been unable to work given the ongoing pain. He has tried physical therapy on two [occasions] and this has not been helpful. He has not had targeted steroid injections, acupuncture, or traction therapy.

(Tr. 1888). On examination, Dr. Patrick noted Plaintiff appeared in obvious discomfort, and his gait, station and balance showed "some unsteadiness with his walking and hobbling type of gait."

(Tr. 1888-89). Dr. Patrick further noted as follows:

I reviewed the MRI from 2014, as well as from an MRI in 2016. The 2014 MRI shows an annular tear at L3-L4 with some modest central protrusion, but no worrisome compression of the traveling L4 nerve roots. There is a hemilaminectomy [sic] defect on the right side at L3.

18

On the new MRI, he has a protruded more disc eccentric to the right, does narrow over the L4 nerve root.

(Tr. 1889).

Dr. Patrick provided the following impression and report of plan:

1. Right L4 radiculopathy.

2. Chronic pain syndrome.

3. Prior lumbar surgery for disc herniation.

The patient has two competing issues here in his pain as I am assessing it. He has a more recent acute stabbing buttock pain that radiates toward the anterior thigh and groin in a more classic L3/4 distribution that may be due from the newer disc rupture, but he does not have obvious clear weakness that I am able to discern.

On the alternate note, he has long-standing severe pain in the lateral aspect of his leg and foot that bothers him all of the time and has been the major issue for him. This lasted many years and has kept him out of work. The stabbing pain that he has is only very intermittent and may not even affect him for few days on end, but the chronic pain in his leg is much more durable persistent overtime and probably the bigger overall pain issue, although the maximum intensity of pain can be episodically greater with the stab in his buttock from the more subacute radiculopathy.

I have discussed with him that I do not think surgery for repeat disc herniation, is going to help his chronic pain whatsoever. Rather this is a spinal cord stimulator type of treatment for chronic pain syndrome.

He does not clearly have weakness, but I have told him this disc rupture could get worse[] and if weakness develops, he would definitely need to be considered for surgery at the L3-L4 level. Either way surgery for the disc rupture and the spinal cord stimulator are likely in the cards at some stage for [Plaintiff]. However at this point, I think he would be better treated with Nevro stimulator option. I discussed the trial with him. I also discussed with him repeated disc ruptures and ultimately leading to fusions on the surgery and then the downstream complicating features of this. I would rather not move this further down the fusion road if possible [because] of his age and try to delay on these interventions as much as possible. . . . I do think it is reasonable to consider an L3-L4 targeted transforaminal injection to see if they may help ameliorate some of the more subacute radicular features of the newer disc rupture. But I am not sure that it is ultimately going to have adequate durability.

(Tr. 1889).

19

## **THE HEARINGS**

### *August 7, 2017 Hearing*

At the August 7, 2017 hearing post-remand, Plaintiff's counsel stated Plaintiff has had chronic back pain since his February 25, 2010 surgery, with the most recent MRIs reflecting a recurrent herniated disc with nerve impingement and radiculopathy at the L3-4 level (Tr. 38). Plaintiff testified that since his surgery he is in "constant pain, real irritable, having hard time sleeping." (Tr. 43-44). Plaintiff stated the pain interferes with his ability to sleep, and on a good night, he sleeps about four to five hours (Tr. 50). According to Plaintiff, although recent epidural steroid injections had helped his legs, they had not helped his back (Tr. 44). Plaintiff noted he still used his cane occasionally (Tr. 53). Plaintiff further testified regarding his anxiety and depression (Tr. 45). A vocational expert also testified at the August 7, 2017 hearing (Tr. 55-59).

### *February 18, 2020 Hearing*

Plaintiff also testified at the February 18, 2020 hearing following remand from the Appeals Council. He was forty-three years of age at the time (Tr. 66). Plaintiff testified he graduated from high school but was unable to complete his college degree because his "back went out and [he] couldn't walk for two weeks and [he] had to drop" his practicum class (Tr. 67, 82). When asked what prevented him from working, Plaintiff stated he has trouble walking and experiences lower back and leg pain; he has pain in his testicles; and he has headaches that can last for days (Tr. 68). Plaintiff stated he has had a herniated disc in his neck for the previous seven years, causing him migraine headaches that last three to five days at a time (Tr. 79). Plaintiff testified he goes to pain management at Trinity Mother Francis in Tyler every three months (Tr. 69). Plaintiff further testified the pain affects his attention, concentration, and ability to focus and also makes him irritable (Tr. 73-74).

According to Plaintiff, his medications make him drowsy (Tr. 70). Plaintiff also stated he has memory problems due to long-term medication use (Tr. 73).

Plaintiff asserted he can sit about thirty to forty-five minutes (but he has to move around a lot), and he can stand for approximately one hour (Tr. 71). Plaintiff stated he can walk for one or two blocks or for approximately thirty minutes (Tr. 72). According to Plaintiff, the heaviest thing he can comfortably lift and carry is ten to fifteen pounds (Tr. 72). Plaintiff stated he also has trouble reaching, and if reaching pulls on his back, it causes pain to radiate down his leg (Tr. 72). Plaintiff noted he has a balance issue and has not tried to stoop or crouch; he also has trouble getting up when he gets on his knees (Tr. 73).

Plaintiff had a cane at the hearing and explained he started using it five or six years prior to the hearing after he fell a few times (Tr. 74). Plaintiff described his routine household activities, stating he is able to cook, load/unload the dishwasher, do some laundry, grocery shop, and attend church (Tr. 74-75). Plaintiff stated he has trouble sitting through the church service and has to stand up at times until the pain calms down (Tr. 76). Plaintiff testified he does not vacuum, sweep, or mop because they tend to bother his lower back and leg (Tr. 75). According to Plaintiff, everything he does "has a consequence." (Tr. 78). More specifically, if he were to sweep the floor, he would have to lay down on the couch for a few hours (Tr. 78). Plaintiff stated pain medication does not fully take away the pain (Tr. 78).

Plaintiff reiterated that his severe limitations had been present for at least ten years (Tr. 77). Despite having surgery on his lower back in February of 2010, Plaintiff did not feel he had a good result (Tr. 77). Plaintiff stated he still had pain in his lower back that radiated into his testicles and down to his right leg, describing the pain as sharp (like if someone were to poke you with a

knife) (Tr. 77). He also experienced numbness from the knee down to the top of his foot, as well as muscle spasms (Tr. 77-78).

Plaintiff stated he had fallen a few times, went to the emergency room, and was not able to walk for about one week, causing his doctor to order an MRI of his lower back (Tr. 79). Although he has had some injections that helped, Plaintiff stated his doctor warned him to be careful "with the injections and doing things, that [he] could actually hurt [himself] worse." (Tr. 79). Plaintiff stated there had been some discussions about additional surgery after the 2016 MRI, but he does not have insurance (Tr. 79).

Plaintiff alleged he has difficulties sleeping at night due to his pain (Tr. 80). He also claimed his anxiety and stress cause lack of sleep. Plaintiff noted his anxiety and depression result from the stressors that accompany his back injury. Plaintiff stated his anxiety and irritability have affected his relationships with other people, including his mental health doctors, his wife, and his children (Tr. 80-81). Plaintiff's attorney asked Plaintiff the following:

> Have you given some thought over these last ten years of trying to go to some inside sit-down job? Why have you not tried to do something [where] you could primarily sit in a work situation? Could you have done something like that?

(Tr. 81). Plaintiff responded that he tried, but he had to get up and walk around so much which was an "issue." (Tr. 81). Plaintiff testified he would not be able to work eight hours a day in a normal, structured situation without more than normal break times, further explaining there would also be days when he could not work at all because of headaches or lower back pain (Tr. 82).

A vocational expert also testified at the February 18, 2020 hearing. The vocational expert described Plaintiff's previous work experience as a car rental clerk as light strength level and skill level of four (Tr. 84). The ALJ then presented the following hypothetical to the vocational expert:

> Let's assume a hypothetical individual of the claimant's age, education, and work history . . . limited to sedentary work and . . . has the ability to lift and/or carry a

maximum of 10 pounds. The individual can sit for 6 hours, stand and/or walk for 2 hours in an 8-hour workday. No limits on the ability to push and/or pull within the weight limits for lifting and carrying. The individual is limited to occasional climbing of ramps or stairs. No climbing of ladders, ropes, or scaffolds. Occasional balancing, stooping, kneeling, crouching, and crawling. The individual is limited to the performance of simple, routine tasks. The individual is also limited to occasional interaction with supervisors, coworkers, and the public. Within these parameters, is it fair to say that the past work would be unavailable because it exceeds the exertion level?

(Tr. 84-85). The vocational expert concluded this individual would not be able to perform Plaintiff's past work; however, there were other jobs at the sedentary level that an individual with those hypothetical limitations would be able to perform (Tr. 85). Specifically, the vocational expert listed addressing clerk, surveillance systems monitor, and document preparer (Tr. 85-86).

For the second hypothetical, the ALJ asked the vocational expert to further assume the hypothetical individual would require the occasional use of a cane for ambulation (Tr. 86). The vocational expert stated the individual would still be able to perform the three listed jobs (Tr. 86).

Finally, Plaintiff's attorney asked the vocational expert to assume the hypothetical individual would be off task and would require two additional breaks per day (Tr. 86-87). The vocational expert concluded the individual, to the extent he or she needed two additional breaks, would not be able to hold any of the three previously stated jobs or any other job in the national economy (Tr. 87). The vocational expert further noted that absenteeism of more than one day per month on a regular and consistent basis would eliminate all competitive employment (Tr. 87-88).

## **APPLICABLE LAW**

### *Standard of review*

In an appeal under § 405(g), the Court must review the Commissioner's decision to determine whether there is substantial evidence in the record to support the Commissioner's factual findings and whether the Commissioner applied the proper legal standards in evaluating the

evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985); *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983). The Court cannot reweigh the evidence or substitute its judgment for that of the Commissioner, *Bowling v. Shalala*, 36 F.3d 431, 434 (5th Cir. 1995), and conflicts in the evidence are resolved by the Commissioner, *Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985).

***Entitlement to benefits***

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence. *Plaisance v. U.S. Comm'r, Soc. Sec. Admin.*, No. 6:18-CV-00033, 2019 WL 2608884, at *14 (W.D. La. May 13, 2019), *report and recommendation adopted sub nom. Plaisance v. U.S. Comm'r*, No. 6:18-CV-00033, 2019 WL 2607498 (W.D. La. June 25, 2019) (citing 42 U.S.C. § 423(a)). The Supplemental Security Income ("SSI") program provides income to individuals who meet certain income and resource requirements, have applied for benefits, and are disabled. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(a)(1) & (2)).

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(A)). A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives,

whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work. *Plaisance*, 2019 WL 2608884, at *14 (citing 42 U.S.C. § 1382(c)(a)(3)(B)).

***Sequential evaluation process and burden of proof***

Pursuant to the statutory provisions governing disability determinations, the Commissioner has promulgated regulations that establish a five-step process to determine whether a claimant suffers from a disability. 20 C.F.R. § 404.1520 (2012). First, a claimant who, at the time of his disability claim, is engaged in substantial gainful employment is not disabled. 20 C.F.R. § 404.1520(a)(4)(i) (2012). Second, the claimant is not disabled if his alleged impairment is not severe, without consideration of his residual functional capacity, age, education, or work experience. 20 C.F.R. § 404.1520(a)(4)(ii) (2012). Third, if the alleged impairment is severe, the claimant is considered disabled if his impairment corresponds to a listed impairment in 20 C.F.R., Part 404, Subpart P, Appendix 1 (2011). 20 C.F.R. § 404.1520(a)(4)(iii) (2012). Fourth, a claimant with a severe impairment that does not correspond to a listed impairment is not considered disabled if he is capable of performing his past work. 20 C.F.R. § 404.1520(a)(4)(iv) (2012). Finally, a claimant who cannot return to his past work is not disabled if he has the residual functional capacity to engage in work available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v) (2012). If, at any step, the claimant is determined to be disabled or not disabled, the inquiry is terminated. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (citing *Lovelace v. Bowen,* 813 F.2d 55, 58 (5th Cir.1987)).

Under the first four steps of the sequential analysis, the burden lies with the claimant to prove disability. *Audler,* 501 F.3d at 448. If the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant can perform. *Greenspan v.*

*Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical–Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen,* 810 F.2d 1296, 1304 (5th Cir.1987). However, this process is used only when an initial determination of disability is being evaluated, not when a claimant is already receiving disability benefits. *See* 20 C.F.R. § 404.1520(a)(5). The Code explicitly states, "If you are already receiving disability benefits, we will use a different sequential evaluation process to decide whether you continue to be disabled. We explain this process in § 404.1594(f)." *Id*.

## THE ALJ'S FINDINGS AND CONCLUSIONS

As a threshold matter, the ALJ found that Plaintiff last met the insured status requirements of the Act on March 31, 2016 (Tr. 12, Finding 1). The ALJ found, through his date last insured of March 31, 2016, Plaintiff had the following combination of severe impairments at step two in the sequential evaluation process: degenerative disc disease, headaches, major depressive disorder, and generalized anxiety disorder (Tr. 12, Finding 3). However, Plaintiff did not have an impairment or combination of impairments that met or equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, most specifically Listing 1.04 and all associated listings (Tr. 12-14, Finding 4).

Next, the ALJ determined that Plaintiff had the residual functional capacity for sedentary work as defined in 20 C.F.R. § 404.1567(a) with certain limitations (Tr. 14-21, Finding 5). Specifically, the ALJ found that Plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently; sit for six hours, stand for two hours, and walk for two hours in an eight-hour workday; and push/pull as much as he could lift/carry (Tr. 15). The ALJ further found Plaintiff could climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds;

he could occasionally balance, stoop, kneel, crouch, and crawl; and he requires the use of a cane for ambulation (Tr. 15). Finally, the ALJ found that Plaintiff could perform simple, routine work tasks with only occasional interaction with coworkers, supervisors, and the public (Tr. 15).

At step four in the sequential evaluation process, the ALJ determined that, through his date last insured, Plaintiff was unable to perform any past relevant work (Tr. 21, Finding 6). At step five, upon consideration of Plaintiff's age, education, work experience, residual functional capacity, and the vocational expert's testimony, the ALJ found Plaintiff could perform other jobs existing in significant numbers in the national economy (addressing clerk, surveillance system monitor, document preparer) (Tr. 21-22, Finding 10). Accordingly, the ALJ found Plaintiff was not under a "disability" as defined in the Act from December 22, 2010, the alleged onset date, through March 31, 2016, the date last insured (Tr. 22-23, Finding 11).

## ANALYSIS

"The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). Substantial evidence is a term of art used to describe how courts are to review agency fact finding. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Under the substantial-evidence standard, a court looks to the existing administrative record to determine whether it contains sufficient evidence to support the agency's factual determinations. *Id.* Although "substantial" has a different meaning in other contexts, the threshold of sufficient evidence to satisfy the substantial evidence standard "is not high." *Id.* Substantial evidence requires more than a mere scintilla of evidence, but it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, a claimant also bears the burden of showing any alleged error of law was prejudicial because the Supreme Court has recognized the doctrine of harmless error applies to administrative determinations, and the Fifth Circuit has specifically held it will not vacate a judgment unless the substantial rights of a party are affected. *See Shinseki v. Sanders*, 556 U.S. 396, 407-08 (2009); *Jones v. Astrue*, 691 F.3d 730, 734 (5th Cir. 2012); *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

The overarching issues are whether substantial evidence of record supports the Commissioner's decision that Plaintiff was not disabled during the relevant period, and whether the ALJ applied the correct legal standards in reaching that decision. Having reviewed the parties' briefs, the Court notes the following specific issues on appeal: (1) whether the ALJ properly found that Plaintiff did not meet or medically equal Listings 1.02(a)(d) and 1.04(c) as of December 22, 2010; (2) whether the ALJ properly considered Plaintiff's non-exertional limitations associated with his mental impairments; and (3) whether the ALJ properly considered medical evidence that related back to Plaintiff's alleged onset date, December 22, 2010. Dkt. No. 14 at 1.

In his first claim for relief, Plaintiff asserts the ALJ erred at step three in failing to properly evaluate the evidence as to whether or not his impairments met the requirements of Listing 1.02 (major dysfunction of the joints)[1] and Listing 1.04 (disorders of the spine). The Court focuses its discussion on Listing 1.04. Plaintiff asserts he met or medically equaled Listing 1.04, arguing in his brief as follows:

---

[1] Although the ALJ did not specifically consider Listing 1.02, the Commissioner points out Plaintiff did not allege or receive treatment for major dysfunction of the joints. Dkt. No. 15 at 6.

> Plaintiff never recovered following his [2010] surgery. Plaintiff was in physical therapy from the date of the surgery through February 2011. Plaintiff was in pain management from March 2011, through December 3, 2013. Plaintiff had another MRI in June 2014 that showed moderate stenosis, dessication and an annular tear. The MRI on July 8, 2016 showed a very large herniation at L4-5. Plaintiff was still walking with a cane. Plaintiff has a right drop foot.

Dkt. No. 14 at 11-12. Plaintiff references, among other medical evidence, Dr. Platt's 2013 opinion of permanent disability, wherein Dr. Platt specifically noted Plaintiff had "weakness, nerve injury in right leg that is permanent and also has neck pain and emotional illness." *Id.* at 8 (citing Tr. 2058). According to Plaintiff, Dr. Platt's examinations support his assessment as they repeatedly revealed abnormal gait, lumbar tenderness and limited range of motion, positive straight-leg-raise tests, and muscle weakness. *Id.*

In its response, the Commissioner asserts Plaintiff fails to meet all the criteria for a listing at step three. The Commissioner acknowledges Plaintiff appears to meet portions of Listing 1.04 (and Listing 1.02). However, the Commissioner argues Plaintiff falls short of meeting his step three burden of proving an inability to ambulate effectively, which the Commissioner asserts is required to meet both listings. Dkt. No. 15 at 6. Even though Plaintiff sometimes used a cane, often had an abnormal gait, and was advised by Nurse Practitioner Kyles to use a cane "on an as-needed basis for increased weakness" (Tr. 1797), the Commissioner focuses on the times when Plaintiff did not use a cane and had a normal gait. *Id.* at 7.

In his reply brief, Plaintiff points out he began experiencing falls in 2013 because of right leg weakness and inability to raise his right foot. Dkt. No. 16 at 2. Plaintiff notes contemporaneous records from Healthcare Express show he had altered gait and posture, ambulation with an assistive device, decreased range of motion in the back, decreased sensation in the bilateral lower extremities, and positive straight-leg-raise tests. *Id.* (citing Tr. 1389). According to Plaintiff, he "was finally able to have another MRI of his back on June 2, 2014," and it showed, among other

29

things, advanced degenerative disc disease with loss of height and desiccation at L5-6. *Id.* at 2-3. Plaintiff further asserts the July 8, 2016 MRI, which showed "a new large right paracentral disc protrusion present producing severe right lateral recess stenosis and mild spinal canal stenosis" (Tr. 1652), supports "Plaintiff's long standing chronic pain syndrome, right L4 radiculopathy, weakness, antalgic gait, limited ROM and need for a cane to keep from falling from December 11, 2010 thru March 31, 2016." *Id.* at 3.

To establish that a claimant's impairments meet or medically equal a listing, the claimant must provide medical findings that support all of the criteria for a listed impairment (or most similarly listed impairment). *Thedford v. Saul*, No. 3:19-CV-1120, 2020 WL 4723062, at *7 (W.D. La. May 19, 2020), *report and recommendation adopted*, No. CV 19-1120, 2020 WL 4724240 (W.D. La. Aug. 13, 2020) (citing *Selders v. Sullivan*, 914 F.2d 614, 619 (5th Cir. 1990)). In determining whether a claimant's impairment(s) equals a listing, all evidence in the case record about the claimant's impairments and their effects are considered. 20 C.F.R. § 404.1526(c). An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990)). If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present. *Id.* (citing *Selders*, 914 F.2d at 620).

Listing 1.04 governs disorders of the spine, resulting in compromise of a nerve root or the spinal cord. *Faulk v. Comm'r of Soc. Sec.*, No. CV 18-0830, 2019 WL 3432134, at *5 (W.D. La. May 24, 2019), *report and recommendation adopted sub nom. Faulk v. U.S. Comm'r Soc. Sec. Admin.*, No. 6:18-CV-00830, 2019 WL 3431605 (W.D. La. July 29, 2019) (citing 20 C.F.R. § 404.1520(a)(4)(iii). at Part 404, Subpart P, Appendix 1, Listing 1.04)). Listing 1.04 requires

showing an abnormality such as spinal stenosis or degenerative disc disease and one of three detailed, medically established conditions accompanied by documented physical limitations.[2] *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.

In *Audler v. Astrue*, the Fifth Circuit Court of Appeals reviewed the ALJ's decision at step three where the ALJ "summarily concluded that '[t]he medical evidence indicates that the claimant has status post lumbar laminectomy, cervical disc herniation, headaches and chronic neck and back pain, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.'" *Daniel v. Comm'r of Soc. Sec. Admin.*, No. 5:20-CV-00155-RWS, 2022 WL 1517177, at *9 (E.D. Tex. Mar. 24, 2022) (quoting *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)). The ALJ "did not identify the listed impairment for which Audler's symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment." *Id.* The Fifth Circuit found this "bare conclusion [was] beyond meaningful judicial review." *Id.* (quoting *Audler*, 501 F.3d at 448 (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996))).

Here, the ALJ found Plaintiff did not meet Listing 1.04, stating *in toto* as follows:

> Specifically, the claimant does not meet Listing 1.04 for disorders of the spine because the evidence of record does not demonstrate compromised nerve root with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, since the alleged onset date. Magnetic resonance imaging (MRI) of the lumbar spine dated June 2, 2014, showed that the conus medullaris, cauda equine, and descending nerve roots were within normal limits. .

---

[2] For example, Listing 1.04A requires compromise of a nerve root or spinal cord, as well as "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *McCullough v. Berryhill*, No. SA-18-CV-00128-ESC, 2019 WL 1431124, at *9 (W.D. Tex. Mar. 29, 2019) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A). To demonstrate the requisite loss of function for a musculoskeletal impairment, Plaintiff must demonstrate "the inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04 (2010).

. . Although there was advanced degenerative changes present, as well as some difficulty with walking, the findings were not consistent with listing 1.04. Thus, this listing is not met.

(Tr. 13).

Courts in the Fifth Circuit have found that even when an ALJ specifically identifies a listing at step three, he/she errs by failing to discuss the medical evidence and provide the reasons for the step three determination because the failure prevents meaningful judicial review. *Daniel*, 2022 WL 1517177, at *9 (citing *Matthews v. Soc. Sec. Admin.*, Civil Action No. 18-00246, 2019 WL 3432336, at *4 (W.D. La. Apr. 5, 2019), *report and recommendation adopted sub nom. Matthews v. U.S. Comm'r of Soc. Sec.*, No. 6:18-CV-00246, 2019 WL 3431604 (W.D. La. July 29, 2019) (citing *Woods v. Colvin*, 2015 WL 5311142, at *11 (N.D. Tex. 2015), *adopted by* 2015 WL 5319926 (N.D. Tex. 2015) (citing cases); also citing *Matthews v. Astrue*, No. 11-667-RLB, 2013 WL 5442265, at *4–5 (M.D. La. 2013) (finding error where the ALJ specifically stated that she considered Listing 1.04A, but did not explain the basis for concluding that the claimant's sensory loss was due to an unrelated problem and failed to discuss or mention any evidence relating to the remaining 1.04A criteria))). For example, in *Faulk*, the court stated that while the ALJ identified 1.04A as the listed impairment, "he failed to identify any of the criteria of 1.04A or provide any explanation as to how he reached the conclusion that the claimant's symptoms are insufficiently severe to meet any listed impairment." *Id.* (quoting *Faulk*, 2019 WL 3432134, at *6). The court also noted the claimant argued the Appeals Council erred in failing to consider a post-operative CT scan report of his lumbar spine which he submitted as new and material evidence further supporting that he met Listing 1.04A. The court found the ALJ failed to properly explain why he found the claimant did not meet Listing 1.04A as required under *Audler* and remanded the case for

such full review, including the "new" evidence of the claimant's December 20, 2017 post-operative CT scan. *Id.*

Similarly here, the Court finds the ALJ failed to properly explain why she found Plaintiff did not meet Listing 1.04. The ALJ identified 1.04 as one of the listed impairments, noting the 2014 MRI of Plaintiff's lumbar spine showed advanced degenerative changes but also showed normal conus medullaris, cauda equine, and descending nerve roots. However, the ALJ failed to provide an explanation as to how she reached the conclusion that Plaintiff's symptoms are insufficiently severe to meet any criteria of 1.04. The ALJ also failed to provide any analysis of medical equivalency, focusing only on whether Plaintiff's severe impairments meet the criteria of any listing. *See Woodbridge v. Colvin*, No. 15-485, 2016 WL 4253971, at *10 (M.D. La. July 14, 2016) (finding ALJ failed to provide analysis of medical equivalency and instructing ALJ on remand to analyze medical equivalence in his step three determination in the event he finds plaintiff failed to meet the listing there at issue); *Persley v. Commissioner of Social Sec. Admin.*, No. 10-1761, 2011 WL 4058985, at *4 (N.D. Tex. Aug. 22, 2011) (recommending remand at step three and explaining that "[i]n his decision, the ALJ explains why Plaintiff does not meet medical listing 7.05 but does not discuss why Plaintiff's condition does not *equal* that medical listing") (emphasis in original); *Mapps ex rel. M.J. v. Astrue*, No. 09-2226, 2010 WL 1946662, at *14 (N.D. Tex. April 30, 2010) ("A failure to consider whether impairments medically equal a listed impairment is reversible error.").

"Although it is not always necessary that an ALJ provide an exhaustive discussion of the evidence, bare conclusions, without any explanation for the results reached, may make meaningful judicial review of the Commissioner's final decision impossible." *Daniel*, 2022 WL 1517177, at *10 (quoting *Inge ex rel. D.J.I. v. Astrue*, Civil Action No. 7:09–CV–95–O, 2010 WL 2473835, at

*9 (N.D. Tex. May 13, 2010) (citing *Audler*, 501 F.3d at 448)). Here, the Court finds the ALJ's failure to properly analyze Listing 1.04 at step three of the five-step sequential evaluation process constitutes legal error.

Because the ALJ erred by not offering sufficient reasons for finding that Plaintiff did not meet or medically equal Listing 1.04, the Court must continue to a harmless error analysis. Not every error warrants reversal or remand. *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003). "Procedural perfection in administrative proceedings is not required," and the Court will vacate a judgment only if "the substantial rights of a party have been affected." *Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir. 1989) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988) (per curiam)).

The listing at issue in this matter is Listing 1.04, which applies to disorders of the spine. Listing 1.04 provides in pertinent part as follows:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> OR
> ....
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Lloyd v. Soc. Sec. Admin.*, No. 6:20-CV-00694, 2022 WL 1009048, at *3–4 (W.D. La. Apr. 4, 2022) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04 (2017)). The Social Security Regulations define "inability to effectively ambulate" as:

> [A]n extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. (Listing 1.05C is an exception to this general definition because the individual has the use of only one upper extremity due to amputation of a hand.) [ ]
>
> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single handrail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Hutchinson on behalf of Hutchinson v. Saul*, No. CV 20-334-BAJ-SDJ, 2022 WL 1716268, at *8 (M.D. La. Feb. 16, 2022), *report and recommendation adopted*, No. CV 20-00334-BAJ-SDJ, 2022 WL 822026 (M.D. La. Mar. 17, 2022).

Plaintiff references both Section A and Section C in his brief. Dkt. No. 14 at 1, 8, 11. There is indication in the medical records that Plaintiff had degenerative disc disease with compromise of a nerve root, causing neuro-anatomic distribution of pain,[3] during the relevant time period.

---

[3] A neuroanatomic distribution of pain "entails pain radiating to the extremities[.]" *Hutchinson on behalf of Hutchinson v. Saul*, No. CV 20-334-BAJ-SDJ, 2022 WL 1716268, at *7 (M.D. La. Feb. 16, 2022), *report and recommendation adopted*, No. CV 20-00334-BAJ-SDJ, 2022 WL 822026 (M.D. La. Mar. 17, 2022) (quoting *Jordan v. Astrue*, No. 101899, 2012 WL 443791, at *7 (W.D. La. Jan. 13, 2012)).

Plaintiff points to numerous medical records indicating his condition is marked by neuro-anatomic distribution of pain, as treatment notes and Plaintiff's statements represent that he suffered from chronic back pain which radiated down his leg. *Matthews*, 2013 WL 5442265, at *6 (citing *Spratley v. Astrue,* Civil Action No. 07–1264, 2008 WL 5330563, at *7 (S.D. Miss. Dec. 12, 2008) (cervical spine impairment was "marked by 'neuro-anatomic distribution of pain,' as several physicians noted that Spratley suffered from neck pain that radiated into her shoulders and arms and caused numbness in her upper extremities")).

Although dated shortly after Plaintiff's date last insured,[4] Dr. Patrick at CHRISTUS Trinity Clinic Neuroscience Institute noted in October of 2016 that Plaintiff had "long-standing severe pain in the lateral aspect of his leg and foot that bothers him all of the time and has been the major issue for him. This lasted many years and has kept him out of work. The stabbing pain that he has is only very intermittent and may not even affect him for few days on end, but the chronic pain in his leg is much more durable persistent overtime and probably the bigger overall pain issue, although the maximum intensity of pain can be episodically greater with the stab in his buttock from the more subacute radiculopathy." (Tr. 1889). There is also evidence in the record showing Plaintiff had limited range of motion, motor loss,[5] positive straight-leg-raise tests, and difficulty walking.

---

[4] A retrospective opinion can prove existence of a disability, but it must clearly refer to the relevant period of disability, rather than relate to the claimant's current status. *Toledano v. Comm'r, SSA*, No. 4:19-CV-00912-ALM-CAN, 2022 WL 17480304, at *6 (E.D. Tex. Nov. 15, 2022), *report and recommendation adopted*, No. 4:19-CV-912, 2022 WL 17477142 (E.D. Tex. Dec. 6, 2022) (citing *Likes v. Callahan*, 112 F.3d 189, 190-91 (5th Cir. 1997)).

[5] Evidence of motor loss includes muscle weakness and a decreased range of motion, among other things. *Matthews*, 2013 WL 5442265, at *6 (citing *Pannell v. Astrue,* Civil Action No. 11–2385, 2012 WL 4341813, at *4 (N.D. Tex. Sept. 21, 2012) ("motor loss (as shown by muscle weakness)"); also citing *Davis v. Astrue,* Civil Action No. 08–411, 2009 WL 2408175, at *3 (S.D. Tex. Aug. 3, 2009) (Listing 1.04A was not met where "the record did not contain evidence of any motor or reflex loss or atrophy, and in fact the evidence indicated 'muscle strength is 5/5 in the lower extremities. That is, no weakness. Hand grip is good. No muscle atrophy was noted.'"); also citing *Smith v. Astrue,* Civil Action No. 09–6210, 2011 WL 722539, at *12 (N.D. Ill. Feb. 22, 2011) (discussing "evidence of motor loss, including decreased strength in her left leg and an inability to squat")).

In her discussion at step three, the ALJ stated there was no evidence of compromised nerve root, referencing only the 2014 MRI (Tr. 13). According to the ALJ, although there was advanced degenerative disc disease present, as well as some difficulty walking, Listing 1.04 was not met.[6] In *Hurst*, the Fifth Circuit determined that "[a]lthough the ALJ failed to cite section 8.05 in her decision, she did cite considerable evidence that bolstered her conclusion that [claimant] 'does not have an impairment or combination of impairments that meets or medically equals the severity' of an impairment listed in Appendix 1," and also discussed a variety of evidence regarding ambulation in the analysis of residual functional capacity. *Hurst v. Colvin*, 639 Fed. Appx. 1018, 1021-22 (5th Cir. 2016). Thus, the court held any error at step three was harmless. *Id.* at 2022. Here, the Court does not find the step three error was harmless.

Not only did the ALJ fail to consider medical equivalency at step three, but she also failed to analyze the effects of Plaintiff's degenerative disc disease in conjunction with Plaintiff's other identified severe impairments, which include headaches, major depressive disorder, and generalized anxiety disorder. Rather, she focused on whether each individual impairment met its specific listing (Tr. 13-14). As explained below, unlike in *Hurst*, the ALJ did not sufficiently analyze the evidence later in her opinion in such a way as to support a conclusion that Plaintiff's degenerative disc disease did not meet or medically equal the listings.

The Commissioner asserts the any error at step three is harmless because Plaintiff cannot show the requisite functional loss. Specifically, the Commissioner points out the ALJ accounted for Plaintiff's difficulty walking by providing for the use of one cane in her residual functional

---

[6] The Court notes the ALJ's discussion of Listing 1.04 in the most recent April 8, 2020 decision is the same as that contained in the October 27, 2017 decision by a different ALJ which was remanded by the Appeals Council for further consideration of the opinions of Plaintiff's treating physicians (Tr. 13, 236).

capacity finding. Dkt. No. 15 at 7-8. This argument requires the Court to consider the ALJ's RFC analysis in conjunction with whether there was harmless error at step three.

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations. *Scott C. P. v. Berryhill*, No. 3:18-CV-00036-D-BH, 2019 WL 1318365, at *11 (N.D. Tex. Feb. 26, 2019), *report and recommendation adopted*, No. 3:18-CV-0036-D, 2019 WL 1315894 (N.D. Tex. Mar. 22, 2019) (citing 20 C.F.R. § 404.1545(a)(1)). It "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." *Scott*, 2019 WL 1318365, at *11 (quoting Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996)). An individual's residual functional capacity should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources. *Id*. (citing 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1).

As noted above, the ALJ determined that Plaintiff had the residual functional capacity for sedentary work as defined in 20 C.F.R. § 404.1567(a) with certain limitations (Tr. 14-21). Specifically, the ALJ found that Plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently; sit for six hours, stand for two hours, and walk for two hours in an eight-hour workday; and push/pull as much as he could lift/carry (Tr. 15). The ALJ further found Plaintiff could climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds; he could occasionally balance, stoop, kneel, crouch, and crawl; and he requires the use of a cane for ambulation (Tr. 15). Finally, the ALJ found that Plaintiff could perform simple, routine work tasks with only occasional interaction with coworkers, supervisors, and the public (Tr. 15).

As noted above, in her step three analysis of Listing 1.04, the ALJ only briefly referenced the 2014 MRI. However, in her discussion of residual functional capacity, the ALJ mentioned the

July 2016 MRI of Plaintiff's lumbar spine and stated it showed, similar to the 2014 MRI, "there was still an annular tear at L3-4 with some modest central protrusion, but no worrisome compression of the traversing L4 nerve roots" and also a hemilaminectomy "defect on the right side at L3." (Tr. 18). However, the ALJ did not mention that the 2016 MRI also showed there was – at the L4-5 level – a "new large right paracentral disc protrusion present producing **severe right lateral recess stenosis** and mild spinal canal stenosis" as well as moderate degenerative disc disease at the L5-S1 level as before "with generalized disc bulging extending to the left and producing mild left lateral recess stenosis as before." (Tr. 1652) (emphasis added). *See Matthews*, 2013 WL 5442265, at *5 (citing *Nieves v. Astrue,* Civil Action No. 12–690, 2013 WL 1192013, at *5 (W.D. Tex. March 21, 2013) ("A rating of moderate [stenosis] indicates that there may be mild compression of the nerve root" (citation omitted)); also citing *Spratley*, 2008 WL 5330563, at *7 ("The record is clear that Spratley's spinal disorder was characterized by nerve root compression. Spratley submitted the records . . . which revealed that Spratley suffered from spinal stenosis.")).

Regarding Plaintiff's functional limitations, the ALJ asserted as follows:

> Although the claimant had complaints of back pain, the undersigned concludes that with his medication, injections, and use of a cane, the claimant could have performed sedentary work. Sedentary work activity is defined as work that involves lifting of no more than 10 pounds. The full range of sedentary work requires sitting for up to six hours during an eight-hour workday and with walking and standing intermittently for up to two hours during an eight-hour workday. The claimant was further limited to only occasional balancing, kneeling, crouching, crawling, stooping, and climbing ramps/stairs, but never climb ladders, ropes, or scaffolds. Giving the claimant the benefit of the doubt, the undersigned finds that the claimant also requires use of a cane for ambulation.

> As previously noted, the claimant testified that the injections have helped with his legs, but not with his lower back pain. Functionally, he noted that he could drive, lift 15-20 pounds, sit for 45 minutes to one hour and stand for an hour. He noted that he could do an activity for an hour to an hour and a half. Moreover, in his function report dated September 2012, the claimant indicated that he could not lift over 30 pounds and that squatting, bending, standing, reaching, walking, sifting, kneeling, and stair climbing caused pain. (Exhibit B9E/6) He asserted the same in

August of 2015, but noted that he could only lift approximately 20 pounds by November 2015. (Exhibits B19E/6, B25E/6) The undersigned further notes that the claimant does not use assistive devices to ambulate all of the time. He indicated that he used a cane on occasions when he was hurting very bad. (Exhibits B19E, B25E) The medical evidence of record also indicated use of a cane, as well as nonuse of a cane. (Exhibits B8F, B18F, B21F, B24F, B25F/20, B29F/61, B31F/22, B32F) In fact, on January 4, 2016, the claimant's gait was described as steady and strong; and, he was not using a cane on that day. He subsequently continued to use the cane intermittently. (Exhibit B32F/8, B35F) The claimant's treating physician noted to use a cane on an as-needed basis for increased weakness. (Exhibit B35F/14) Moreover, the objective medical evidence of record shows that the claimant had generally normal muscle strength and is generally neurologically intact. However, the record also shows that the claimant has fallen and experiences chronic pain and radiculopathy. Therefore, based upon the totality of the record, the undersigned fin[d]s that the residual functional capacity, described above, is consistent with and accommodates the claimant's overall subjective complaints and the objective medical findings.

(Tr. 18-19).

Here, the ALJ noted Plaintiff had chronic pain and radiculopathy, had fallen, and had often used a cane. However, the ALJ did not specifically discuss the numerous records from the relevant time frame regarding Plaintiff's "hunched" posture and antalgic gait, muscle weakness, decreased range of motion, and difficulty walking such that he required the use of a cane. For example, in late 2011, Plaintiff presented to Healthcare Express with aching and dull lower back pain, numbness, and weakness (Tr. 846-47). On examination, Plaintiff was found to be in obvious distress ("chronic moderate"); he had an altered gait and posture ("walking slowly and leaning forward"); he had spasm/tenderness of paraspinal muscles; and he had diffuse spinal tenderness of lumbar spine and decreased range of motion in his back (Tr. 847). Plaintiff presented to CHRISTUS St. Michael on March 8, 2013, complaining of lower back pain after a fall three days prior (Tr. 950-57).

In a Medical Release/Physician's Statement dated April 9, 2013, treating physician Henry J. Platt, M.D., opined Plaintiff could sit, stand, and walk for only very limited time due to frequency

of breaks for pain; he could not climb stairs/ladders, kneel/squat, bend/stoop, push/pull, or lift/carry; and he could use a keyboard for four hours but would need frequent breaks for pain (Tr. 2058). Dr. Platt opined Plaintiff could not lift/carry objects more than two (2) pounds for more than four (4) hours per day (Tr. 2058). Dr. Platt noted Plaintiff had to frequently stand and move to find a position of comfort (Tr. 2058). Dr. Platt concluded Plaintiff's disability was permanent, noting Plaintiff's primary disabling diagnosis was low back pain and his secondary disabling diagnosis was radiculopathy and weakness on the legs (Tr. 2058). According to Dr. Platt, Plaintiff had weakness, nerve injury in his right leg that was permanent, as well as neck pain and emotional issues (Tr. 2058).

In her assessment of Plaintiff's residual functional capacity, the ALJ gave Dr. Platt's April 9, 2013 opinion "little weight."[7] (Tr. 20). According to the ALJ, the physical examinations did not support the extreme limitations provided by Dr. Platt, noting Plaintiff did not have a severe neck impairment or significant loss of sensory or motor function in the bilateral extremities that would support Dr. Platt's restrictions in lift/carry and postural functions (Tr. 20). Noting Plaintiff occasionally used a cane because of falls, the ALJ stated balance and coordination "have generally

---

[7] The Social Security Administration has promulgated a new regulation regarding the evaluation of medical opinions that is applicable to claims filed on or after March 27, 2017. 20 C.F.R. § 404.1520c. However, Plaintiff filed his application for disability insurance benefits on April 27, 2012 and his subsequent claims for disability benefits on July 27, 2015 (Tr. 174). With respect to claims filed before March 27, 2017, the ALJ must evaluate medical opinion evidence in the manner prescribed by 20 C.F.R. § 404.1527. *Bridget B. P. v. Saul*, No. 3:18-CV-835-BT, 2019 WL 4805948, at \*6 (N.D. Tex. Sept. 30, 2019).

Pursuant to the applicable regulation, unless controlling weight is given to a treating source's opinion per § 404.1527(c)(2), an ALJ must consider the following factors in determining the weight to give to "any medical opinion:" (1) the physician's examining relationship; (2) the nature and extent of the treatment relationship: length of treatment and frequency of examination; (3) the support a medical source presents for its opinion, in terms of objective evidence and explanation; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician; and (6) other factors, including a medical source's amount of understanding of "our disability programs and their evidentiary requirements." 20 C.F.R. § 404.1527(c). The ALJ's decision does not appear to clearly consider or apply these factors.

been intact, and back inspections did not reveal significant deficits despite advanced degenerative disc disease on the latest MRI prior to March 31, 2016, the date last insured." (Tr. 20).

Substantial evidence does not support this conclusion. At his August 4, 2015 routine follow up appointment at Healthcare Express (Tr. 1504-06), Dr. Platt noted Plaintiff had an abnormal gait (walked with a cane usually, wide base, antalgic), limited range of motion limited to Plaintiff's L Spine, and positive TTP (tender to palpation) of the L Spine (Tr. 1505). On September 1, 2015, Plaintiff's gait was slow to stand erect, hunched forward while walking (Tr. 1502). At his September 29, 2015 appointment, Plaintiff did not have his cane, but he was slow to stand and slightly hunched forward (Tr. 1498). Plaintiff was using a cane at his late October 2015 appointment and had an antalgic gait and limited range of motion (Tr. 1494).

On February 17, 2016, Plaintiff presented to Nurse Practitioner Johnia Kyles with sharp low back pain radiating to the buttocks and legs (Tr. 1805). On examination, Nurse Practitioner Kyles noted Plaintiff had tenderness and limited range of motion and was ambulatory with a cane (Tr. 1806). By June of 2016, Plaintiff reported he had fallen several times due to increased weakness (Tr. 1802). On examination, Nurse Practitioner Kyles noted abnormal muscle strength; weakness to right lower extremity with atrophy to right ankle; malalignment, tenderness, and limited range of motion; tenderness to palpation in right lower lumbar paraspinal muscle into the right buttock; and positive straight leg raise, "sit slump with concordant pain to right, relieved with cervical flexion." (Tr. 1802) (capitalization removed). Plaintiff was ambulating with a cane and had irregular and antalgic gait with diminished, asymmetrical reflexes (Tr. 1802). Nurse Practitioner Kyles advised Plaintiff to use a cane as needed for increased weakness (Tr. 1803). She also ordered the 2016 L-Spine MRI which, as noted above, showed severe right lateral recess stenosis and mild spinal canal stenosis at the L4-5 level.

42

In sum, after reviewing the medical evidence in the record and the entirety of the ALJ's opinion, the Court finds the ALJ's step three error was not harmless. Because Plaintiff has presented evidence which corresponds to the requisite criteria under Listing 1.04, the Court finds Plaintiff's substantial rights were affected by the ALJ's failure to provide a sufficient explanation as to her step three finding and by her failure to explicitly analyze medical equivalence in her step three determination. *See Woodbridge v. Colvin*, No. 15-485, 2016 WL 4253971, at *10 (M.D. La. July 14, 2016) (finding ALJ failed to provide analysis of medical equivalency and instructing ALJ on remand to analyze medical equivalence in his step three determination in the event he finds plaintiff failed to meet the Listing there at issue). Moreover, the ALJ did not discuss or otherwise analyze the effects of Plaintiff's degenerative disc disease in conjunction with Plaintiff's other identified severe impairments, which include headaches, major depressive disorder, and generalized anxiety disorder, focusing instead on whether each individual impairment meets its specific listing (Tr. 13-14). *Reed v. Saul*, No. CV 20-331-JWD-SDJ, 2022 WL 956295, at *5 (M.D. La. Mar. 14, 2022), *report and recommendation adopted*, No. CV 20-331-JWD-SDJ, 2022 WL 949865 (M.D. La. Mar. 29, 2022).

As the ALJ further failed to properly analyze Dr. Platt's treating source opinion under 20 C.F.R. § 404.1527(c), the Court finds remand appropriate. The Court recommends this case be remanded for full review under Listing 1.04 from the alleged onset date of December 22, 2010 through March 31, 2016, the date last insured. Remand is further warranted for a more thorough analysis of Plaintiff's treating source opinion and, if warranted, Plaintiff's residual functional capacity.[8]

---

[8] Because the ALJ's error at step three and in evaluating Plaintiff's treating source opinion necessitate remand, Plaintiff's additional arguments need not be considered.

## **RECOMMENDATION**

The Court, having considered the parties' arguments and the evidence, finds remand appropriate. Accordingly, it is

**RECOMMENDED** the above-entitled Social Security action be **REVERSED AND REMANDED**.

### Objections

Within fourteen (14) days after service of the Magistrate Judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court, except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriquez v. Bowen*, 857 F.2d 275, 267-77 (5th Cir. 1988).

SIGNED this the 15th day of February, 2023.

_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE